AJG

the demonstration and why he allowed Mr. Kouatou to come to his house.

The Court certainly has some credibility concerns about why the respondent, if he was such a well-know person in Cameroon, is not mentioned in either articles on Cameroon or in other human rights publications. The Court also finds it curious why he went to a demonstration and why he would take such risks to have members of the Bepanda Nine come to his house, as well as how the respondent was able to get a U.S. visa and to disguise the torture if it was such severe torture. The Court finds this to be legitimate concerns, concerning his credibility.

However, the Court in looking at all the evidence and testimony, finds that by and large the respondent's testimony is consistent with this asylum application and what he told the Asylum Officer. In addition, it appears that his testimony is generally corroborated by the documents he filed in support of his application. In addition, the respondent generally explained the discrepancies between his testimony and what he had either written down in his asylum application or he told the Asylum Officer.

Then the issue is whether these concerns with the respondent's credibility are significant enough to find the respondent's testimony to be not credible. The Court finds that while they are legitimate concerns, they do not rise to the level of a finding that the respondent's testimony lacks credibility.

A 95 461 653                          11                        January 16, 2003

AJG

The respondent has explained that he did feel strongly about this case. He also indicated he was involved with this organization called Justice and Peace. Respondent indicates that he was able to get the U.S. visa because he was able to walk by that time and was able to disguise the injuries. While the Court does have some concerns about the plausibility of the respondent's explanations, the Court simply cannot find that his testimony is not credible.

Accordingly, the Court finds that the respondent has met his burden of proof to establish past persecution, as well as a well-founded fear of future persecution. There appears to be no adverse factors in this matter. And, the Court will grant the respondent's asylum application in the exercise of discretion.

### ORDERS

IT IS HEREBY ORDERED that the respondent's application for asylum under Section 208 of the Act is granted.

MICHAEL W. STRAUS
Immigration Judge

A 95 461 653                              12                       January 16, 2003

4)   Copy of <u>Kelly Saint Ford v. Ashcroft</u>.



# United States Court of Appeals

## For the First Circuit

No. 02-2451

KELLY SAINT FORT,

Petitioner, Appellant,

v.

JOHN ASHCROFT, Attorney General,

Respondent, Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Lynch, Circuit Judge,

Campbell, Senior Circuit Judge, and

Howard, Circuit Judge.

---

Allan M. Tow for appellant.

Christopher C. Fuller, Senior Litigation Counsel, with whom Robert D. McCallum, Jr., Assistant Attorney General, Michael P. Lindemann, Assistant Director, and Janice R. Redfern, Attorney, Office of Immigration Litigation, were on brief for appellee.

May 9, 2003

---

**LYNCH, Circuit Judge.** Kelly Saint Fort, a Haitian and a legal permanent resident of the United States, committed an aggravated felony and so the Immigration and Naturalization Service initiated removal proceedings to deport him. Saint Fort claimed protection from deportation, "deferral of removal," under the United Nations Convention Against Torture ("CAT"), arguing he would be jailed and tortured if returned to Haiti. An Immigration Judge ("IJ") agreed; the Board of Immigration Appeals ("BIA"), on review, did not. Saint Fort seeks to have judicial review of his case; as a matter of statutory law, he may not petition for review in the court of appeals, given the nature of his claims. This left only habeas corpus jurisdiction, which he invoked in the district court. The district court dismissed the habeas petition for lack of jurisdiction, accepting the government's argument. The case is before us on appeal from that dismissal.

The respondent Attorney General argues that no court has jurisdiction, even under habeas, to review any aspect of the BIA's determination. The issue is one of first impression for this court. We reject that argument and hold that habeas jurisdiction remains available here. Reviewing Saint Fort's claims about the BIA's determination under the CAT, we reject his claim of denial of due process and so affirm, on that ground, the dismissal of his habeas petition.

I.

Saint Fort, now 27 years old, entered the United States in 1988, at the age of 12, and settled in the Dorchester area of Boston as a lawful permanent resident. In 1999, Saint Fort was convicted in New Hampshire of second-degree assault and receiving stolen property, and was sentenced to concurrent prison terms of two to four years. Saint Fort v. Ashcroft, 223 F. Supp. 2d 343, 343-44 (D. Mass. 2002). Subsequently, removal proceedings were instituted against him as an aggravated felon. See Immigration and Nationality Act ("INA") § 237(a)(2)(A)(iii), 8 U.S.C. § 1227(a)(2)(A)(iii) (2000) ("Any alien who is convicted of an aggravated felony at any time after admission is deportable."); INA § 101(a)(43)(G), 8 U.S.C. § 1101(a)(43)(G) (aggravated felonies include "a theft offense (including receipt of stolen property) or burglary offense for which the term of imprisonment [is] at least one year").

Saint Fort responded by requesting asylum, withholding of deportation, and non-refoulement (non-return) under the CAT. Because of his status as an aggravated felon, he was ineligible for asylum and withholding of deportation. In a November 6, 2001 hearing before an IJ on his CAT claim, Saint Fort presented little evidence to substantiate his fear of torture. He informed the IJ that he had no family in Haiti, and that if he returned his life would be "over." He asserted that deportees were routinely tortured in Haiti. When cross-examined as to the basis for his belief, he said that at least a year earlier he had read an article in a newspaper he thought was called "U.S. Today" which said that deportees were being killed in Haiti. Saint Fort did not have a copy of this article at the hearing. Saint Fort also said that he had friends from the Dominican Republic who advised him to pray that he not be deported because, if he were, he would certainly be tortured. Saint Fort did not offer any testimony relating to himself or his family to explain why he might be targeted for mistreatment. [1]

In addition to his testimony, Saint Fort also submitted supporting documentation, including country reports on Haiti and a BIA decision on conditions in Haiti. That unpublished decision, In re Perez, was issued on October 22, 2001. [2] In Perez, the BIA relied on the State Department's country report on Haiti, which noted in pertinent part that deportees are now being held indefinitely in Haitian prisons. Conditions in those prisons, the BIA stated, were "extremely poor, to the point that the health of detainees is severely compromised by lack of adequate food and medical attention. Moreover, . . . police forces beat, torture, and otherwise mistreat detainees. As a direct result of these conditions, multiple detainees have died while in custody." The BIA concluded that it was "more likely than not" that the petitioner in Perez would "be subjected to torture by or with the acquiescence of a public official in Haiti." As a result, Perez was found to have met his burden of proof under the CAT, and he was granted deferral of removal to Haiti.

The IJ issued an oral decision in Saint Fort's case on the same day as the hearing. He found that, as an aggravated felon, Saint Fort was statutorily ineligible for asylum or withholding of removal, but eligible for deferred removal under the CAT. The IJ reviewed country reports on Haiti, the BIA's decision in Perez, and Saint Fort's hearing testimony. He noted Saint Fort's testimony that "he has no family in Haiti, and that he will be tortured if he returns to Haiti and [is] put in jail." The IJ concluded that it was more likely than not that Saint Fort would be imprisoned and tortured if returned to Haiti. The IJ reasoned,

The reports concerning the conditions of Haitian jails lead[] only to one conclusion, that the respondent's return to Haiti and being detained and placed in jail in Haiti, would subject him to torture, based on the conditions of jails in Haiti as stated in the documentation submitted . . . and what is contained in [Perez].

The IJ granted Saint Fort's application for deferred removal under the CAT.

The INS appealed the IJ's decision to the BIA. The BIA reversed the IJ's decision, in reliance on an intervening published BIA decision and the absence of other evidence from Saint Fort. That published decision, In re J-E-, 23 I. & N. Dec. 291 (BIA), available at 2002 WL 481156 (Mar. 22, 2002), reversed course and found that conditions in Haiti's jails did not constitute torture under the CAT. In J-E-, the BIA reviewed a case, similar to Perez, in which the petitioner argued -- based on country condition reports, newspaper articles, and a letter from an official at the State Department -- that prison conditions in Haiti amounted to torture. Id. at 293. In a reversal from Perez -- but without citing Perez -- the BIA concluded in J-E- that the indefinite detention of criminal deportees by Haitian authorities did not constitute torture within the meaning of the relevant regulations, 8 C.F.R. § 208.18(a) (2002), because there was no evidence that the authorities intentionally and deliberately detain deportees in order to inflict torture. 23 I. & N. Dec. at 299-302. Citing the decision in J-E-, the BIA dismissed Saint Fort's appeal and ordered him removed to Haiti.

Saint Fort did not timely apply for reconsideration by the BIA. (3) He filed a petition for review of the BIA's decision in the court of appeals under 8 U.S.C. § 1252(b). This court questioned whether it had jurisdiction in the case because Saint Fort had been convicted of an aggravated felony, and there was no question as to that fact or the fact that he was not a U.S. citizen. See INA § 242(a)(2)(C), 8 U.S.C. § 1252(a)(2)(C) ("[N]o court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense . . . ."). Saint Fort then voluntarily dismissed the petition for review in the court of appeals and turned to the district court.

On June 27, 2002, Saint Fort filed a petition for habeas corpus with the district court. He alleged that the BIA's decision violated his statutory and regulatory rights under the INA and the Administrative Procedure Act, and his constitutional rights under the Due Process and Equal Protection Clauses, because (1) it denied him the opportunity to present evidence of the possibility he will be tortured in Haiti, (2) it upset settled expectations established by In re Perez, (3) the decision-making was arbitrary and inconsistent, and (4) the application of In re J-E- was impermissibly retroactive. The government responded that the district court lacked jurisdiction because Saint Fort had failed to exhaust his administrative remedies. Saint Fort, 223 F. Supp. 2d at 343.

The district court expressed skepticism about Saint Fort's petition, noting that a motion to reopen on the basis of new evidence would be futile because Saint Fort had conceded that he had no new evidence, and also commenting that the debate over retroactivity was "somewhat besides the point" given that In re J-E did not announce a new rule. Id. at 345. Still, on September 30, 2002, the district court remanded the case to the BIA for clarification of the grounds of its denial and continued Saint Fort's stay of removal during that period. Id. at 346. The district court said it was troubled by the BIA's holding that Saint Fort had offered no evidence to the IJ that he would be tortured when, in fact, the IJ had both Saint Fort's documentary evidence and his testimony, and when the IJ had found Saint Fort credible. Id. at 345-46.

The government then filed a motion to reconsider, arguing (1) that the district court had erred in its reading of the BIA's decision, and (2) that the district court lacked subject matter jurisdiction to hear Saint Fort's claim because the CAT is not self-executing. It raised the lack of jurisdiction argument for the first time. Specifically, the government argued that Congress had authorized the Attorney General to promulgate regulations for implementing the CAT when it passed the

Foreign Affairs Reform and Restructuring Act ("FARRA"), Pub. L. No. 105-227, Div. G., § 2242(b), 112 Stat. 2681-761, 2681-822 (1998). Congress also explicitly limited federal court jurisdiction to review any decision on a claim for protection under the CAT, by limiting jurisdiction "except as part of the review of a final order of removal pursuant to section 242 of the [INA]." Id. § 2242(d), 116 Stat. at 2681-822. Here, there was no review of a final order of removal because of Saint Fort's uncontested status as an aggravated felon; as a result, the government contended, there could be no jurisdiction over his claim under the CAT. The government attempted to distinguish INS v. St. Cyr, 533 U.S. 289 (2001), by arguing that, because the CAT is not a self-executing treaty, Congress never affirmatively granted such jurisdiction in the first place. On October 29, 2002, the district court allowed the motion to reconsider and dismissed Saint Fort's habeas petition. Saint Fort now appeals this ruling.

## II. Background
### A. Convention Against Torture

The United Nations Convention Against Torture and Other, Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, G.A. Res. 39/46, Annex, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984), 23 I.L.M. 1027 (1984), provides that "[n]o State Party shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." Id. Art. 3, § 1.

The CAT was ratified by the United States Senate in 1990 and entered into force for the United States in November 1994. See Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8478 (Feb. 19, 1999) (background). In October 1998, Congress passed FARRA, which states:

It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture . . . .

FARRA § 2242(a), 112 Stat. at 2681-822. FARRA also delegates the responsibility for "prescrib[ing] regulations to implement the obligations of the United States" under the CAT to "heads of the appropriate agencies." Id. § 2242(b).

FARRA also, under the title "Review and Construction," contains a jurisdiction-limiting provision and a "zipper clause." **(4)**

[N]o court shall have jurisdiction to review the regulations adopted to implement this section, and nothing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under the Convention or this section, or any other determination made with respect to the application of the policy set forth in subsection (a), except as part of the review of a final order of removal pursuant to section 242 of the Immigration and Nationality Act (8 U.S.C. [§] 1252).

Id. § 2242(d). The jurisdiction-limiting provision denies jurisdiction over review of the regulations, and the zipper clause purports to confine review of claims to the specific context of a review of a final order of deportation. Thus, for aliens like Saint Fort who have been convicted of aggravated felonies, the court of appeals' jurisdiction to engage in direct review is foreclosed because § 242 review

is unavailable to such aliens. See Calcano-Martinez v. INS, 533 U.S. 348, 349-50 (2001).

The Justice Department has promulgated a set of regulations implementing FARRA, in accordance with Congressional direction. See 64 Fed. Reg. 8478, codified at scattered sections of 8 C.F.R. Specifically, these regulations define torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1). The burden of proof is on the applicant to show that he or she is more likely than not to be tortured if removed. Id. § 208.16(c)(2); see id. § 208.17(a) (application of standard to deferral of removal). The regulations instruct immigration officials to consider inter alia evidence of past torture inflicted on the applicant and evidence of "gross, flagrant or mass violations of human rights within the country of removal." Id. § 208.16(c)(3); see id. § 208.17(a) (application to deferral of removal).

B. Habeas Corpus Jurisdiction in Immigration Cases

The writ of habeas corpus has been employed by non-citizens for centuries in both the United States and Britain. See J.L. Hafetz, Note, The Untold Story of Noncriminal Habeas Corpus and the 1996 Immigration Acts, 107 Yale L.J. 2509, 2524 & n.115 (1998) (citing eighteenth-century cases and noting that "aliens in the United States have . . . been able to challenge their confinement through habeas corpus since the nation's founding"). "Even before the federal government took on the task of regulating immigration, federal courts employed the writ of habeas corpus to inquire into the lawfulness of the return of foreign sailors who had allegedly deserted their ships, extradition of aliens accused of crime, and detention of enemy aliens during the War of 1812." G.L. Neuman, Jurisdiction and the Rule of Law After the 1996 Immigration Act, 113 Harv. L. Rev. 1963, 1966 (2000).

Before 1996, aliens had a broad right to judicial review in the courts of appeal. Aliens facing deportation possessed a general right of appeal from final orders of the BIA to the court of appeals under the "old" INA. (5) 8 U.S.C. § 1105a(a)(7) (1994) (repealed 1996). Aliens also had two routes to challenge a final order of deportation through employing the writ of habeas corpus. First, "old" INA itself provided for specific habeas corpus review. 8 U.S.C. § 1105a(a)(10) (1994) (repealed 1996). Second, aliens could challenge a deportation order under the general habeas corpus statute, 28 U.S.C. § 2241 (2000), which provides habeas review for individuals "in custody in violation of the Constitution or laws or treaties of the United States." Id. § 2241(c)(3).

In 1996, Congress passed two laws that dramatically changed judicial review of immigration decisions. See generally Goncalves v. Reno, 144 F.3d 110 (1st Cir. 1998), cert. denied 526 U.S. 1004 (1999). The first of these was the Antiterrorism and Effective Death Penalty Act ("AEDPA"), enacted on April 24, 1996. Pub. L. No. 104-132, 110 Stat. 1214 (1996). AEDPA repealed "old" INA's habeas provision. Id. § 401(e), 110 Stat. at 1268. In its stead, AEDPA added a new provision reading, "Any final order of deportation against an alien who is deportable by reason of having committed [an enumerated crime] shall not be subject to review by any court." Id. § 440(a), 110 Stat. at 1276 (now codified at 8 U.S.C. § 1252(a)(2)(C)). As in the present case, aliens who had been convicted of a wide range of crimes were thereby barred from petitioning courts of appeal for direct judicial review of their final orders of deportation.

Then, on September 30, 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"). Pub. L. No. 104-208, Div. C, 110 Stat.

3009-546 (1996). Under IIRIRA, deportation proceedings were restyled removal proceedings. IIRIRA provided for two sets of rules: "transitional" rules applicable to aliens whose deportation proceedings had commenced prior to April 1, 1997, but who had not received a final order until after October 30, 1996, and "permanent" rules applying to aliens whose deportation or removal proceeding commenced on or after April 1, 1997. Id. § 306(c), 110 Stat. at 3009-612; id. § 309, 110 Stat. at 3009-625. We have discussed IIRIRA's transitional rules elsewhere. See Goncalves, 144 F.3d at 116-18. The permanent rules govern this case.

Under the permanent rules, IIRIRA perpetuated AEDPA's jurisdictional ban prohibiting review "by any court" of an order of removal against an alien aggravated felon. IIRIRA § 306(a)(2), 110 Stat. at 3009-607 (relocating AEDPA's jurisdiction-limiting language to 8 U.S.C. § 1252). It provides, in 8 U.S.C. § 1252 (a)(1), that "judicial review of a final order of removal . . . is governed only by" the procedures for review of agency orders in the court of appeals under 28 U.S.C. §§ 2341-2351. A section entitled "Consolidation of questions for judicial review" provides that "[j]udicial review of all questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section." 8 U.S.C. § 1252(b)(9).

IIRIRA also added a new subsection, entitled "Exclusive Jurisdiction," which removed jurisdiction from all courts to hear claims arising from the Attorney General's decision or action to commence proceedings, adjudicate cases, or execute removal orders. IIRIRA § 306(a)(2), 110 Stat. at 3009-612, (codified at 8 U.S.C. § 1252(g)). This provision had the effect of shielding certain of the Attorney General's exercises of discretion from judicial scrutiny. The Supreme Court has since been explicit that this limit on judicial scrutiny applies only to the three discrete actions described in § 1252(g). See Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 482-83 (1999).

In the wake of AEDPA and IIRIRA, federal courts have recognized the redrawn contours of their jurisdiction. Because the principles developed in these cases control our interpretation of FARRA's jurisdiction-limiting provision and zipper clause, we review them briefly. In Goncalves, as here, there was no direct appeal to appellate courts for individuals like Goncalves (who had been convicted of crimes of moral turpitude). 144 F.3d at 117 & n.6. We then turned to the question of habeas jurisdiction in the district courts. Relying on Felker v. Turpin, 518 U.S. 651 (1996), we found it "clear that if Congress intends to repeal or restrict habeas jurisdiction under § 2241, it must say so explicitly. Thus, we will not find a repeal of § 2241 merely by implication, but only by express congressional command." Goncalves, 144 F.3d at 119. We concluded that there had been no express repeal of § 2241 under either AEDPA or IIRIRA, id. at 120, and that there was no implicit repeal in conjunction with AEDPA's repeal of habeas corpus jurisdiction under old INA, id. at 120-22. This holding avoided questions about the outer limits of Congress's power under Article III to control the jurisdiction of the federal courts. It also obviated the need to address possible Suspension Clause issues raised by Congress's actions. Id. at 122-23.

In Mahadeo v. Reno, 226 F.3d 3 (1st Cir. 2000), this court extended Goncalves to the permanent rules under IIRIRA, and held that the jurisdiction-limiting provisions of IIRIRA precluded direct review in the court of appeals but did not divest district courts of their § 2241 habeas corpus jurisdiction. **(6)** Without an express reference to § 2241, we held, there could be no repeal, id. at 12, particularly because Congress had been placed on notice by the decision in Felker, three months before IIRIRA was enacted, id. at 14. "Congress has shown in enacting IIRIRA that it knows how to use explicit language when it intends to place limitations on judicial review under particular statutes." Id. at 13-14. Mahadeo also rejected the argument that a zipper clause was meant to repeal habeas

jurisdiction. Id. at 12.

Most importantly, the Supreme Court decided two cases in 2001 addressing the question of habeas corpus review after the 1996 legislation. In St. Cyr, 533 U.S. 289, the Court considered the impact of AEDPA's jurisdiction-limiting provision, AEDPA § 401(e), as well as three provisions under the permanent rules in IIRIRA, including a zipper clause, 8 U.S.C. §§ 1252(a)(1), 1252(a)(2)(C), 1252(b)(9). The Court began with the "strong presumption in favor of judicial review of administrative action and the longstanding rule requiring a clear statement of congressional intent to repeal habeas jurisdiction," 533 U.S. at 298, and canons obligating avoidance of serious constitutional questions by an alternative construction, id. at 299-300. It concluded that "a construction of the amendments at issue that would entirely preclude review of a pure question of law by any court would give rise to substantial constitutional questions." Id. at 300.

Noting that "at the absolute minimum, the Suspension Clause protects the writ 'as it existed in 1789,'" the St. Cyr Court then turned to historical evidence. Id. at 301 (quoting Felker, 518 U.S. at 663-64). It found that the "historical core" of the writ of habeas corpus has been review of the legality of executive detention, and "it is in that context that its protections have been strongest." Id. It also noted that "to conclude that the writ is no longer available in this context would represent a departure from historical practice in immigration law." Id. at 305.

Examining the statutory provisions, the Court drew a distinction between "judicial review" and "habeas corpus." The term "judicial review" is the focus of each of the three IIRIRA jurisdiction-limiting provisions. In the immigration context, the Court reasoned, "judicial review" and "habeas corpus" "have historically distinct meanings." Id. at 311 (citing Heikkila v. Barber, 345 U.S. 229 (1953)). In Heikkila, the Court noted, preclusion of judicial review did not entail cessation of habeas review. Id. at 311-12. As to the zipper clause, the Court held that it was an attempt to consolidate judicial review of immigration proceedings into one action, and did not bar habeas jurisdiction of orders not subject to judicial review. Id. at 313. The absence of an alternative judicial forum also troubled the Court:

If it were clear that the question of law could be answered in another judicial forum, it might be permissible to accept the INS' reading of § 1252. But the absence of such a forum, coupled with the lack of a clear, unambiguous, and express statement of congressional intent to preclude judicial consideration on habeas of such an important question of law, strongly counsels against adopting a construction that would raise serious constitutional questions. Accordingly, we conclude that habeas jurisdiction under § 2241 was not repealed by AEDPA and IIRIRA.

Id. at 314 (citation omitted).

In a companion case issued the same day, the Court affirmed that criminal aliens were precluded from seeking direct review on questions of law in the court of appeals, and must therefore be able to proceed with their habeas petitions:

We agree with petitioners that leaving aliens without a forum for adjudicating claims such as those raised in this case would raise serious constitutional questions. We also agree . . . that these concerns can best be alleviated by construing the jurisdiction-stripping provision of [IIRIRA] not to preclude aliens such as the petitioners from pursuing habeas relief pursuant to § 2241.

Calcano-Martinez, 533 U.S. at 351; see also Zadvydas v. Davis, 533 U.S. 678, 687-88 (2001) (§ 2241 habeas corpus jurisdiction not repealed by provisions of AEDPA and IIRIRA).

More recently, in Demore v. Kim, No. 01-1491, 2003 WL 1960607 (U.S. Apr. 29, 2003), the Court rejected the argument that jurisdiction-limiting provisions of 8 U.S.C. § 1226(e) deprived federal courts of jurisdiction to entertain a habeas petition from a legal permanent resident detained without bail pending his removal proceeding. The Court examined the language of § 1226(e), which provides:

(e) Judicial review

The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole.

It then found that the respondent's challenge to the statutory scheme was not an attack on a discretionary judgment by the Attorney General or on a decision made by the Attorney General regarding detention, and that habeas review was not barred under § 1226(e). The Court made three rulings significant for our purposes: (1) it emphasized that, where review of constitutional issues is said to be precluded, Congress must be clear in its intent, see Webster v. Doe, 486 U.S. 592, 603 (1988); (2) it reiterated its requirement in St. Cyr that any repeal of habeas review requires a particularly clear statement that such is Congress's intent; and (3) it read the jurisdiction-limiting provision in § 1226(e) as applying only to review of the Attorney General's discretionary judgment. Demore, 2003 WL 1960607, at *5 (Rehnquist, C.J.).

   III. Existence of Habeas Jurisdiction The initial question presented is whether federal courts possess § 2241 habeas jurisdiction over claims that arise under the implementing legislation and regulations of the CAT, and that are asserted by aliens who are statutorily ineligible for judicial review of their final orders of removal because they have been convicted of aggravated felonies. This is a question of first impression for this circuit. The Supreme Court's decisions in St. Cyr and Demore mandate the conclusion that habeas jurisdiction has not been repealed in such cases, as do the controlling precedents in this circuit: Goncalves and Mahadeo. Here, there is no statement of congressional intent to preclude review of constitutional claims. There is the absence of explicit language by Congress repealing § 2241 jurisdiction. There is also implied congressional knowledge of judicial precedents interpreting similar provisions; the distinction between "judicial review" and "habeas corpus" in the immigration context; the weight of historical precedent supporting continued habeas review in immigration cases; the problem of lack of an alternative forum; and the importance of avoiding a construction of FARRA that would give rise to grave constitutional concerns. The Second Circuit has also concluded that habeas jurisdiction exists in these circumstances. Wang v. Ashcroft, 320 F.3d 130, 142 (2d Cir. 2003).

FARRA's jurisdiction-limiting provision refers only to review of regulations; its zipper clause provides only that "nothing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under the Convention or this section, or any other determination made with respect to the application of the policy set forth" concerning the CAT. FARRA, § 2242(d), 112 Stat. at 2681-822. We read this section in terms of its language and no more

broadly. See Demore, 2003 WL 1960607, at *5. FARRA does not expressly refer to 28 U.S.C. § 2241 or to habeas review and we would not imply an intent to repeal habeas jurisdiction from silence. See Demore, 2003 WL 1960607, at *5; Mahadeo, 226 F.3d at 11; Goncalves, 144 F.3d at 119.

Since no challenge is made in this case to the FARRA regulations, we assume the government is relying on the zipper clause. There are a number of problems with that reliance. First, it ignores the teaching set forth in St. Cyr and reinforced in Demore that "judicial review" and "habeas" are distinct processes. St. Cyr, 533 U.S. at 311; see Demore 2003 WL 1960607, at *14 (O'Connor, J., concurring in part). Second, the zipper clause is a consolidation of statutory jurisdiction, not a repeal of habeas jurisdiction. Third, by its literal terms, the clause says it "does not provide" jurisdiction, not that it repeals jurisdiction.

In addition, the government's reading would leave no forum available to hear any CAT-based claims, a disfavored situation. See St. Cyr, 533 U.S. at 314. The government apparently finds nothing troubling about this prospect. But it is easy to imagine a scenario in which problems in the BIA's review amounted to a constitutional violation -- or, indeed, a scenario in which the BIA provided no review at all. Instead, by finding the existence of habeas review for claims arising under the implementing legislation of the CAT, we are able once again to avoid the pitfalls of a construction of the statute that would entirely preclude judicial review, giving rise to substantial constitutional questions.

Moreover, the consequences of finding that there was no habeas review available in Saint Fort's case would run contrary to a long history of use of habeas by aliens to challenge confinement in violation of treaty obligations. See, e.g., Mali v. Keeper of the Common Jail (Wildenhus's Case), 120 U.S. 1 (1887) (petition for habeas pursuant to consular agreement between the United States and Belgium). American courts have exercised habeas review over claims of aliens based on treaty obligations since the earliest days of the republic. See W.F. Duker, A Constitutional History of Habeas Corpus 200-01 (1980); Brief Amici Curiae of Legal Historians in INS v. St. Cyr, 533 U.S. 289, 16 Geo. Immigr. L.J. 465, 482 (2002) (listing cases considering habeas petitions from deserting sailors pursuant to treaty and federal legislation). History is important here because the Suspension Clause's protections are at their greatest height when guarding usages of the writ that date to the founding. See St. Cyr, 533 U.S. at 300-02.

The Attorney General argues that the issue presented here is qualitatively different. He contends that St. Cyr and the other earlier cases are distinguishable because the CAT is not a self-executing treaty, and so it does not create in any individual a right to bring a cause of action in federal court unless and until Congress expressly grants jurisdiction for the courts to hear such a claim. This argument misses the point in several ways. As framed by the Attorney General, the real question is not one of a grant of jurisdiction (habeas jurisdiction exists), but whether there is some sort of right actionable under existing grants of jurisdiction. The CAT -- considered in isolation -- clearly is not a self-executing treaty. See Wang, 320 F.3d at 140. And it is also true that treaties that are not self-executing "could not therefore give rise to privately enforceable rights under United States law." Igartua de la Rosa v. United States, 32 F.3d 8, 10 n.1 (1st Cir. 1994) (per curiam).

But this case is not a question of a claim simply arising under treaty that is not non self-executing. The CAT has been implemented in the United States through FARRA and the subsequent regulations. FARRA gives the CAT domestic effect. FARRA and the regulations are now the positive law of the United States, and, as such, are cognizable under habeas. "When the stipulations [of a treaty] are not self-executing they can only be enforced pursuant to legislation to carry them into effect, and such legislation is as much subject to modification and repeal by

Congress as legislation upon any other subject." Whitney v. Robertson, 124 U.S. 190, 194 (1888); see also Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 808 (D.C. Cir. 1984) (Bork, J., concurring) ("Absent authorizing legislation, an individual has access to courts for enforcement of a treaty's provisions only when the treaty is self-executing, that is, when it expressly or impliedly provides a private right of action.") (citing Head Money Cases, 112 U.S. 580 (1884)).

Here, authorizing legislation and implementing regulations have been enacted. Saint Fort's claims do not rest solely on a treaty that is not self-executing; they rest on the CAT through the FARRA and the regulations, and on a claim of violation of constitutional rights. See Cornejo-Barreto v. Seifert, 218 F.3d 1004, 1011 n.6 (9th Cir. 2000) ("Because Congress passed legislation implementing Article 3 of the Torture Convention in the extradition context, we need not reach the issue of whether that portion of the treaty is self-executing."); see also Wang, 320 F.3d at 141 n.17 ("Once Congress created rights under CAT by enacting FARRA, § 2241 necessarily became a proper avenue of relief for individuals in custody in violation of FARRA and its implementing regulations.").

For these reasons, we find that the district court had jurisdiction over Saint Fort's habeas petition, and that we have jurisdiction to review the denial of that petition.

IV.

Our review of the district court's denial of a habeas petition is de novo. Nadeau v. Matesanz, 289 F.3d 13, 15 (1st Cir. 2002). As petitioner says, "the claim that Mr. Saint Fort is making [is] a legal claim that the BIA deprived him of due process by retroactively applying Matter of J-E-." **(7)**

The scope of habeas review is not the same as the scope of statutory judicial review in the courts of appeal. Heikkila, 345 U.S. at 236. At a minimum, habeas review encompasses constitutional claims that are at least colorable. United States ex rel Accardi v. Shaughnessy, 347 U.S. 260, 268 (1954). This includes an assessment of whether a particular set of facts amounts to a constitutional violation. E.g., Zadvydas, 533 U.S. at 699. Habeas also encompasses colorable claims that an alien's statutory rights have been violated. Id. at 688; Carranza, 277 F.3d at 71. Included in this category are issues of the proper construction of a statute, which is an issue of law. Goncalves, 144 F.3d at 124-25. As a result, if a statute makes an alien eligible to be considered for a certain form of relief, he may raise on habeas the refusal of the agency to even consider him. But he may not challenge the agency's decision to exercise or not exercise its discretion to grant relief. Carranza, 277 F.3d at 71 (citing Goncalves, 144 F.3d at 125).

We have also said generally that "pure issue[s] of law" may be raised in habeas. Goncalves, 144 F.3d at 113; see also Ruckbi v. INS, 285 F.3d 120, 124 n.6 (1st Cir. 2002); Carranza, 277 F.3d at 72. The entire content of that phrase has not been worked out. In St. Cyr, the Supreme Court referred to the use of habeas to correct "errors of law, including the erroneous application . . . of statutes." 533 U.S. at 302. In Demore, the Court upheld the use of habeas to challenge on constitutional grounds "the statutory framework" permitting detention without bail. 2003 WL 1960607, at *5. The Second Circuit in Wang has suggested that habeas jurisdiction encompasses at least the situation in which what is at stake is the BIA's application of legal principles to undisputed facts. 320 F.3d at 143. See also 8 C. Gordon, S. Mailman & S. Yale-Loehr, Immigration Law and Procedure § 104.04[4][b], at 104-48.9 to 48.10 (2003) (collecting variety of situations in which courts have found jurisdiction under § 2241). We need not reach that issue because it is not

presented by the claim here, which is a constitutional one.

Saint Fort's claims boil down to an argument that his constitutional rights to due process have been violated by the retroactive application of In re J-E-. This retroactive application, Saint Fort argues, disrupted his settled expectations, was arbitrary, and denied him the opportunity to be heard, all in violation of due process.

This is not a question of whether, as in St. Cyr, a statute is to be given retroactive effect. It is quite clear that decisions of the Supreme Court apply to all cases then pending before the courts on direct appeal, see Harper v. Va. Dep't of Taxation, 509 U.S. 86, 97 (1993), and the same rule is permissible for administrative agencies. (8)

We understand Saint Fort's due process argument to have two prongs. The first is that an agency may not simply reverse course and depart from its prior precedent; such an action may be arbitrary and may violate due process. That is true up to a point. "Agencies do have leeway to change their interpretations of laws, as well as of their own regulations, provided they explain the reasons for such change and provided that those reasons meet the applicable standard of review." Harrington v. Chao, 280 F.3d 50, 59 (1st Cir. 2002). We have applied this rule to the BIA. See, e.g., Davila-Bardales v. INS, 27 F.3d 1, 5 (1st Cir. 1994). (9) Here, there is an ample explanation for the position taken in In re J-E-. There is no claim that the new position violates the statute.

It is true that In re J-E- does not reference Perez, but J-E- contains a full explanation for the rule it adopts. Had the Perez approach been embodied in a formal rule of the BIA, the burden of explaining that the BIA was making an "avowed alteration" of the Perez approach might be greater, in order to avoid a finding that the shift in direction was arbitrary. See INS v. Yang, 519 U.S. 26, 32 (1996); Johnson v. Ashcroft, 286 F.3d 696, 705 (3d Cir. 2002). But here, the fact that the overruling of an unpublished opinion was done sub silentio does not make the change in approach arbitrary where there is a full explanation of the reasons for the new approach. See generally 8 C.F.R. § 3.1(g).

Alternatively, there might be an argument that Saint Fort relied on the rule as set forth in Perez and did not produce evidence he would otherwise have produced. Cf. Landgraf v. USI Film Prods., 511 U.S. 244, 270 (1994) ("[R]etroactivity is a matter on which judges tend to have 'sound instincts' and familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance.") (citation omitted). Whether failure to put on evidence in reliance on an unpublished opinion, said by the agency to have no precedential value, could ever raise an independent due process claim is doubtful. Still, the BIA has itself recognized on occasion that a change in its approach may cause unfairness and has allowed reopening of proceedings to pursue asylum claims. In re G-C-L-, 23 I. & N. Dec. 359, 362 (BIA), 2002 WL 1001051 (Apr. 10, 2002); In re X-G-W-, 22 I. & N. Dec. 71 (BIA), 1998 WL 378104 (June 25, 1998). But the BIA has chosen not to do so here of its own accord. The facts here do not present the question of whether the due process clause requires a court to order the BIA to reopen here. Saint Fort admits that he has no further evidence to put in, and he did not rely on Perez in that sense.

There being no due process violation, we **affirm** the denial of the writ of habeas corpus.

1. In his initial claim for asylum, Saint Fort wrote that his grandfather had been active in the Tonton Macoutes, and that he would be tortured as a result. The Tonton Macoutes were the personal police force of Haitian dictator Francois (Papa Doc) Duvalier, and served his son Jean-Claude (Baby Doc) Duvalier until Jean-Claude's overthrow in 1986. At the IJ hearing on his CAT claim, Saint Fort did not return to this argument.

2. As an unpublished decision, it does not "serve as precedent[] in all proceedings involving the same issue or issues." 8 C.F.R. § 3.1(g) (2002).

3. Saint Fort did submit a motion to reconsider, but it was filed one day after the 30-day deadline. The BIA accordingly rejected the motion as untimely.