**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**Richard Sitcha,**
**(A95 461 653)**

**V.**

**Frederick MacDonald, High Sheriff, Franklin County House of Corrections; Tom Ridge, Secretary, Department of Homeland Security; Michael Garcia, Assistant Secretary (Designee), Bureau of Immigration and Customs Enforcement (ICE); Eduardo Aguire, Acting Director, Bureau of Citizenship and Immigration Services("CIS"); Bruce Chadbourne, Interim Director, ICE, Boston, Respondents**

**Case No. 04-CV-300090-MAP**

**MEMORANDUM IN SUPPORT OF MOTION TO RELEASE THE PETITIONER ON BAIL**

In support of this motion to release the Petitioner on bail the Petitioner alleges the following:

**BACKGROUND**

1. Petitioner is subject to a final order of deportation (removal) issued by the Board of Immigration Appeals on February 25, 2004. Pursuant to that order deportation he is

presently being detained at the Franklin House of Corrections. He has been held since September 18, 2003, after his affirmative asylum petition was ultimately denied.

2. Petitioner is a 42 year old male, native and citizen of Cameroon. Petitioner affirmatively applied for asylum shortly after entering the U.S. He was initially granted asylum, then his asylum case was re-opened and subsequently denied. His claim was based on his participation and activity surrounding the Cameroon government's responsibility for the disappearance of nine young men known as the "Bepanda 9."

3. On January 16, 2003, the Immigration Judge granted Petitioner's application for asylum. The Department of Homeland Security ("DHS) filed a motion to re-open proceedings, claiming that it had new evidence that cast doubt on the Petitioner's credibility. In support of its motion, DHS submitted an unsigned, undated, unidentified document containing information allegedly collected in response to questions posed to people in Cameroon, and an email from the Cameroon embassy claiming that there are a lot of fraudulent asylum claims filed by Cameroonians, and complaining of the work generated for embassy employees by fraudulently filed claims for asylum.

4. The Immigration Judge (IJ) granted DHS' motion to reopen over Petitioner's objection without a hearing on the merits of the motion. The IJ then conducted another merits hearing on the Petitioner's asylum claim, which consisted of telephonic testimony by an embassy employee in Cameroon who claimed to have conducted telephonic interviews with various individuals or their alleged representatives regarding certain issues in the

Petitioner's case. Following this, the IJ issued a decision finding Petitioner not credible and denying his asylum claim. The IJ relied primarily on two parts of the testimony of the embassy employee: (1) that the employee spoke to the lead attorney investigating the Bepanda 9 case and the lawyer said that neither he nor his client, the mother of one of the nine missing boys, knew Petitioner; and (2) that a priest working on the Bepanda 9 case, to whom Petitioner had given a report, denied to the embassy employee that he knew Petitioner or that Petitioner had given him any report.

5. Petitioner timely appealed to the Board of Immigration Appeals, which denied his appeal on February 25, 2004.

6. Petitioner grew up in Cameroon with wealthy parents who own and operate a coffee and cocoa plantation and manage rental property. Petitioner earned his law degree in 1986. He began his bailiff internship in 1992. As part of his internship, he worked with an attorney, Ms. Kogla. He lived well in Cameroon, where he had his own house and a car. Petitioner married in 1992 and has two children. He has been a member of the Catholic Church since birth.

7. Beginning in 2002, an armed branch of the government of Cameroon began to kill large part of the population. In January 2001, this arm took nine children. The majority of the nine children were from Petitioner's ethic group and two of them were children of a neighbor in his village, Madame Kouatou. She came to see him in February 2004. She knew that he knew some people in the government and she wanted to know if through his

connections, he could help find her children.

8. Petitioner promised to help her. He went to the police station where the children were supposed to be. Through talking to people that he knew, he learned that it was likely that the children were no longer alive. Petitioner then agreed to help Ms. Kouatou press the government for an explanation, but asked that his name not be used in conjunction with the case because it would be dangerous for him. Petitioner instructed the families to post fliers and stage government protests. He denied involvement with the case when questioned by the government.

9. Petitioner continued to assist the families of the missing children. He met with a Catholic priest, Father Mukengeshayi and discussed his activities. Petitioner agreed to provide information to the priest that the priest sought to publish under his own name in a Catholic Newspaper.

10. The families of the missing children and their supporters continued to hold demonstrations and encounter police resistance. On March 25, 2001, there was a march with violent protests. The next day, officials visited Petitioner's office. They searched his office and said they knew that he was behind the marches. They found a copy of the report that the petitioner had given to the Catholic Priest. They handcuffed Petitioner. They took him to headquarters and interrogated him. He was imprisoned and tortured with beatings and other acts of debasement.

11. Petitioner's boss, Madame Kogla demanded that he be brought in front of the prosecutor. As a favor to him, the prosecutor agreed to release him on bond, continued his case and told him he had better flee. He was charged with working with Catholics, which are considered the opposition to the government.

12. Petitioner went under the protection of a priest. He was hospitalized for his injuries. With the assistance of a priest, he obtained a visa and left Cameroon. He prepared his asylum application without an attorney and with the belief he would be able to tell his whole story at the interview.

13. The Petitioner indicated he had $25,000 in assets to the court and was not eligible for a court appointed attorney.

14. The Petitioner has retained counsel and has $10,000 available for bail purposes.

15. The Petitioner, if released will reside with his good friend, Hyverna DiPombe, at 276 Collins Street, Apt 305, Hartford, Connecticut 06105.

16. The Petitioner will agree reporting 2-3 times a week to USCIS as a condition of his release.

17. The Petitioner will agree to any other condition the court deems appropriate.

18. The Petitioner is an involved parishioner of St. Anne/Immaculate Conception Church in Hartford, this parish has a number of supporters of the Petitioner. In addition, the Petitioner is supported by Students and faculty at Wesleyan University, Middletown Connecticut. In April 2003, Petitioner gave a lecture to French Research Department at Wesleyan University. This lecture was about why he left Cameroon and came to the U.S. He also assisted the French Department with their research projects.

19. The Petitioner has strong ties to Hartford Connecticut, where has been working and residing since April 2001 when he arrived from Cameroon.

20. The petitioner is not a risk for flight, his passport and personal identification is in the possession of DHS.

## STANDARD FOR GRANTING BAIL

In Mapp v. Reno, 241 F.3d 221(2d Cir. 2001), the Second Circuit held that the District Courts possess the inherent power to grant bail to habeas petitioners who are being detained by the INS. Mapp, 241 F.3d at 223. That power, however, is "a limited one, to be exercised in special cases only." Id. at 226. When considering a request for bail the court must make a two step inquiry. First, it must be determined whether the petition raises a "substantial" claim. Second, the court must consider whether the grant of bail is necessary to make the habeas remedy effective. Id at 230.

## THE PETITIONER RAISES A SUBSTANTIAL CLAIM FOR RELIEF

A substantial claim for relief is found where a petitioner relies on clear case law establishing the likelihood of success on his claim. e.g., Mapp, 241 F.3d at 230.

In this case we believe the Petitioner has raised a substantial claim for the following reasons:

### I. The IJ erred in granting DHS' motion to re-open because the motion did not comply with the requirements of 8 CFR 1003.2 ( c ).

A judge's discretion to grant a motion to reopen is limited by 8 CFR 1003.2(c). This regulation provides in relevant part:

A motion to reopen proceedings shall state the new facts that will be proven at a hearing to be held if the motion is granted and shall be supported by affidavits or other evidentiary material....A motion to reopen shall not be granted unless it appears...that evidence sought to be offered is material and not available and could not have been discovered or presented at the former hearing...

The IJ should not have granted the motion submitted by the DHS in this case because: (1) it was not supported by affidavits or other admissible evidentiary material, (2) there is no

showing that the material presented in the motion was not available or could not have been discovered and presented at the former asylum hearing, and (3) the assertions made in the motion misconstrued previous testimony and were not material.

**a. The Immigration Judge should have denied the motion to reopen because it was not supported by affidavits or other evidentiary material.**

A motion to re-open is designed to allow a party to re-open proceedings so that the IJ can consider new evidence. To decide whether to grant the motion, the IJ must evaluate the "new" evidence to determine if its discovery warrants re-opening proceedings. The motion to re-open at issue in this case was not supported by sufficient evidentiary material. While it is true that the Federal Rules of Evidence do not apply to immigration proceedings, it is also true that there are standards of reliability that apply out of the requirement of basic fairness. In recognition of this fact, 8 CFR 1003.2 ( c ) specifies that the evidentiary material required to re-open a case take the form of affidavits or similarly acceptable and reliable documents. The motion presented by the DHS consists of a brief by the trial attorney, a one-page document entitled "Richard Sitcha Affair," and an e-mail or teletype message from the Cameroon embassy. None of these documents rises to even the lowest threshold of reliability.

The document entitled "Richard Sitcha Affair" is not signed or dated, nor is the identity of the author anywhere on the document. In the DHS brief, the trial attorney represents that the information came from an employee at the United States Embassy in Cameroon, but the document falls far short of being an affidavit. The document itself bears no

indicia of reliability and, even under the relaxed standards in immigration court, cannot possibly satisfy the standard of evidence necessary to justify a remedy such as a motion to re-open.

The other document submitted in support of the motion to re-open is a three-page teletype from the embassy in Cameroon lamenting the amount of work that is generated for the embassy when Cameroonians file asylum claims. This document, which is dated February 2002, has absolutely no relevance to the Petitioner's particular claim. It contains anecdotal evidence regarding false asylum claims filed by persons from Cameroon seeking economic advantage in the United States. Its prejudicial effect far outweighs its probative value, which is zero. It is nothing more than a device to inflame the IJ into thinking that the Petitioner made a false asylum claim.

Because the material submitted by DHS in support of its motion to re-open is not the form of affidavits or other reliable documentation, the IJ erred in granting the motion.

**b. The Immigration Judge should have denied DHS' motion to re-open because DHS did not show that the material presented in the motion was not available or could not have been discovered and presented at the Petitioner's asylum hearing.**

Motions to re-open are reserved for the presentation of evidence that was not available or could not have been discovered and presented at the former hearing. This limitation

prevents the moving party, here Petitioner, a measure of finality. The federal district court in Walters v. Ashcroft, 291 F. Supp. 2d 237 (SDNY 2003) upheld the importance of this rule. In Walters, the petitioner sought a writ of habeas corpus to vacate a final order of deportation entered by the Board of Immigration Appeals ("BIA"), which vacated the Board's previous order granting relief to the petitioner. The Board reversed its ruling based on the government's motion to reconsider.

In Walters, the government used its motion to reconsider as a vehicle for presenting evidence, not previously presented, that revealed that the petitioner was not eligible for the relief that he sought. After the BIA granted the motion to reconsider and vacated the order granting the petitioner relief the petitioner filed suited in federal court, arguing that the BIA violated his rights to due process by granting a motion to reconsider based upon new evidence. The district court agreed with the petitioner, holding that the only proper way to introduce new evidence is a motion to re-open. In reaching its conclusion, the court explained that because the evidence that the government sought to introduce was clearly available and discovered before the (BIA's first ruling granting the petitioner relief, it could not properly form the basis for a motion to re-open.

In this case, DHS is relying upon evidence that was previously available to re-open the case DHS based its motion to re-open on two pieces of "new" evidence, the investigation of a consular official and e-mail correspondence between the United States Embassy in Cameroon and the Secretary of State. Neither the investigation nor the e-mail is new evidence that the DHS could not have discovered prior to the Petitioner's first asylum

hearing. Either the consular official's investigation was undertaken before the asylum hearing and was available at the time and is not new, or it was undertaken after the asylum hearing as an afterthought by DHS. DHS knew the subject matter of the investigation and the areas of questioning that it requested in the investigation from the time that the Petitioner submitted his asylum application and attended his interview, both of which occurred before May 2002; The DHS had six months from the date of the asylum interview to the date of the asylum hearing to conduct any additional inquiries. The fact that DHS may have felt after the Petitioner's hearing that it did not do a thorough enough job before the hearing is not the standard by which a motion to re-open is measured.

The second piece of evidence offered in the motion to re-open is e-mail correspondence dated February 6, 2002. On its face, this document cannot constitute newly discovered evidence for an asylum hearing that occurred in January 2003. Because the material that forms the basis for the DHS motion to re-open was not previously unavailable, it cannot form the basis for a motion to re-open. The IJ erred in granting the motion.

**c. The IJ erred in granting the motion to re-open because the assertions made in the motion misconstrued previous testimony and were not material.**

DHS relied primarily upon a document entitled the "Richard Sitcha Affair" to support its motion to re-open. Based upon this document, the DHS contends that it established the following material information: (1)The Petitioner was not a bailiff in Cameroon; but had

passed the entrance exam. This information was already established through the Petitioner's own testimony regarding his employment both on his asylum application, during his interview, and during the asylum hearing. Tr., p. 17-18. He explained that he was a bailiff-in-training; (2) The Petitioner was not involved in the investigation of the Bepanda 9. The Petitioner discussed this information candidly during his asylum hearing. He did not claim to be an investigator or a lead investigator, he claimed only to be advising the son of one of the mother's of the Bepanda 9 as to how to press the case to hold the government accountable and he asked that his name not be used in connection with these activities. Tr., p.30; and (3) Ms. Kouatua, the woman who the Petitioner said contacted him for help with the case states she does not know him. This allegation is not based even on a one-step hearsay conversation between the investigation and Ms. Kouatua but is the investigator's report from a telephone conversation that he had with a lawyer in Cameroon. The investigator does not claim that the lawyer spoke to Ms. Kouatua regarding this question, but only that the lawyer claimed that Ms. Kouatua does not know Mr. Sitcha.

The information presented by the DHS in support of its motion to re-open, lacks relevance or any indication of reliability to allow it to be deemed material enough to justify the remedy of re-opening. The case IJ erred in granting the motion.

## II. The Immigration Judge erred and violated the Petitioner's due process rights when he granted the motion to re-open.

The liberty of an individual is at stake when the government seeks to deport an alien. Bridges v. Wixon, 326 U.S.135, 154 (1945). Because of this, the Fifth Amendment entitles aliens to due process of law in deportation proceedings. Reno v. Flores, 507 U.S. 292, 307 (1995). Aliens are entitled to a full and fair hearing that accords with the principles of due process. In Walters v. Ashcroft, supra, a federal district court held that the BIA violated an alien's due process rights when a without hearing, it granted a government Motion to Reconsider that supplemented the record in violation of the Code of Federal Regulations.

In the instant case, the DHS filed its motion to re-open and the Petitioner filed a brief in opposition. On April 15, 2003, the IJ held a hearing, which the Petitioner assumed would be his opportunity to argue why the IJ should deny the DHS motion. Instead of conducting a hearing on the merits of the motion, the IJ opened the hearing by describing it as a "re-opened removal hearing:" Counsel for the Petitioner asked the IJ on what basis he re-opened the case. The IJ never answered the question but proceeded to arrange the logistics for the next merits hearing.

By accepting without question the material submitted by the DHS in support of its Motion to re-open without first determining whether the information was material, sufficiently reliable, or unavailable or undiscoverable at the Petitioner's asylum hearing, and by denying the Petitioner the opportunity to argue its inadmissibility or relevance, the IJ denied the Petitioner due process and a hearing that comported with the principles of fundamental fairness.

The due process test for admissibility of evidence in a deportation hearing is whether the evidence is probative and whether its use is fundamentally fair. Felzcerek v. INS, 75 F.3d 112 (2ndCir. 1996). In the evidentiary context fairness is closely related to the reliability and trustworthiness of the evidence. Id. Hearsay is an out-of-court statement introduced to prove the truth of the matter asserted: Fed. R. Evid. 801( c ). Hearsay is generally inadmissible because the statement is inherently untrustworthy, the declarant may not have been under oath at the time of the statement, his or her credibility cannot be evaluated at trial, and he or she cannot be cross-examined.

In Ezeagwuna v. Ashcroft, 301.F 3d 116 (3d Cir. 2002) aff'd 325 F3d 396 (3rd Cir, 2003) the Third Circuit Court of Appeals considered the use of hearsay testimony in and asylum case involving a native of Cameroon. In that case, the Immigration and Naturalization Service (INS) provided a two-page letter from the Vice Consul of the Embassy in Cameroon that set forth in summary fashion the results of an investigation conducted into five documents submitted by the Petitioner. The letter concluded that the documents were fraudulent. The Third Circuit held that relying on this inherently unreliable evidence to deny the Petitioner's asylum claim violated the Petitioner's due process rights.

In describing the evidence, the Third Circuit noted that the letter sought to report statements and conduct of declarants who were far removed from the evidence sought to be introduced. The evidence was information from individuals who purportedly told

something to an investigator who told the information to the writer of the letter submitted to the court. The court found that these multiple layers of hearsay rendered the evidence unreliable and untrustworthy and that reliance on such evidence violated the Petitioner's due process rights.

The evidence that IJ relied upon in this case to deny the Petitioner's asylum claim is no more trustworthy than that rejected by the court in Ezeagwuna. The IJ focused on two areas of testimony by the embassy investigator: (1) the statement that the attorney for the families of the missing children said that the woman that he represents does not know the Petitioner; and (2) the statement that the priest that the investigator spoke to said that he did not know the Petitioner. This testimony suffers on several levels. First, it is hearsay, and in one case, it is hearsay within hearsay. Second, a government official is questioning people about the involvement of others in an affair for which it is widely know that participants have been punished. In such a situation it is imperative that the declarants testify directly and that their statements be evaluated directly rather than funneled through a government functionary. In addition there is little information about the investigation itself. It appears at best to have been a series of telephone calls during which the interviewer could not be sure of the identity of the person to whom he is speaking or the speaker's understanding of the individual about whom he was being questioned. As the court in Ezeaqwuna noted, the mere fact that the investigator works for the embassy cannot be used to bolster the quality of this unreliable and untrustworthy evidence.

The IJ's reliance on unreliable, untrustworthy telephonic hearsay testimony to reverse his finding on the Petitioner's credibility was in error and violated the Petitioner's right to due process.

**THE GRANT OF BAIL IS NECESSARY TO**

**MAKE THE HABEAS REMEDY EFFECTIVE**

Presumably, this requirement is met where bail is necessary to avoid immediate deportation or possibly in cases where a petitioner's assistance to his case is vital and such assistance is not possible from the place of detention. Evangelista v. Ashcroft, 204 F. Supp. 2d 407. In this case, the Petitioner was beaten up in early February 2004, while in custody and hospitalized for the injuries sustained during this beating. The incident has caused the Petitioner to suffer the same peril he suffered while in custody in Cameroon. The Petitioner, if released would then be capable of assisting his own defense by having fruitful communication with counsel and individuals in Cameroon who may be capable of assisting the Petitioner in demonstrating there is a colorable claim for habeas relief. Currently, Petitioner's incarceration thwarts his ability to assist in his defense because he is unable to have meaningful telephone or personal contact with parties that would aid in his claim for relief. Therefore, a grant of bail is necessary to make the habeas remedy effective.

**DUE PROCESS VIOLATIONS REQUIRE PETITIONER'S RELEASE**

Section 1231(a)(2) of Title 18 of the United States Code, which was enacted as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996("IIRIRA"), amended the Immigration and Nationality Act mandate that certain aliens must be detained during a 90-day removal period, which begins when their order of removal becomes final.

Once the 90 day removal period, runs 8 U.S.C. §§ 1231(a)(3) and (a)(6) govern release/detention of an alien under a final order of removal.

Section 1231(a)(3) sets out the appropriate conditions for release of aliens who cannot be deported within the 90 day removal period:

Supervision after 90-day period. If the alien does not leave or is not removed within the removal period, the alien, pending removal, shall be subject to supervision under the regulations prescribed by the Attorney General. The regulations shall include provisions requiring the alien—

(A) to appear before an immigration officer periodically for identification;

(B) to submit, if necessary, to a medical and psychiatric examination at the expense of the United States Government;

(C) to give information under oath about the aliens nationality, circumstances, habits, associations, and activities and other information the Attorney General considers appropriate; and

(D) to obey reasonable written restrictions on the alien's conduct or activities that the Attorney General prescribes for the Alien.

Section 12319(a)(6) allows the Attorney General to continue to detain certain inadmissible or criminal aliens beyond the 90-day removal period:

An alien ordered removed who is inadmissible under section 212(8USCS §1182) removable under section 237(a)(1)(C), 237(a)(2), or 237(a)(4)[8 USC § 1227(a)(1)(C), (a)(2) or(a)(4)] or who has been determined by the Attorney General to be a risk to the Community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3). Petitioner submits he does not fall into either category.

In any event section 1231(a)(6) does not authorize the INS to detain an alien beyond the 90-day removal period if there is "no reasonable likelihood that the alien will be removed in the reasonably foreseeable future." See Ma v. Reno, 208 F.3d 818.

The Petitioner's continued detention violates § 1231 (a)(6) because, given that there is no indication when the Petitioner would be removed even though the Petitioner has provided the Department of Homeland Security with his Cameroon Passport and other

personal identification including birth certificate and marriage license. Petitioner's indefinite detention under 8 U.S.C. § 1231(a)(6) exceeds the Respondents' statutory authority to detain. Zadvydas v. Davis, 533 U.S. 678, 150 L. Ed. 2d 653, 121 S. Ct. 2491 (2001). We construe the statue to contain an implicit "reasonable time" limitation, the application of which is subject to federal court review". Zadvydas, 121 S. Ct. at 2495). See also Lin Guo Xi v. United States Immigration and Naturalization Service, 298 F.3d 832 (9th Cir., 2002)

Therefore, since there is "no reasonable likelihood that the alien will be removed in the reasonable future Id." Petitioner must be released under the conditions set out in 1231 (a)(3). See also Ma, 208 F.3d at 815.

**PRAYER FOR RELIEF**

WHEREFORE, Petitioner prays that the court order the Respondents to release the Petitioner from their custody immediately (under reasonable conditions of supervision).

I verify under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Respectfully Submitted,

Dated: August 6, 2004

John P. McKenna

## Certificate of Service

I hereby certify that I served a copy of the foregoing motion, by hand delivery, this 9th day of August 2004 on:

Assistant United States Attorney
Karen Goodwin
U.S. Attorney's Office
1550 Main Street, Room 310
Springfield, MA 01103

John P. McKenna