UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
Hartford, Connecticut

EXHIBIT - L

File A 95 461 653                          January 16, 2003


In the Matter of


SITCHA, RICHARD                )        IN REMOVAL PROCEEDINGS
                               )
        Respondent             )


CHARGES:     Section 237(a)(1)(B) of the Immigration and
             Nationality Act - non-immigrant who remained
             longer than permitted.


APPLICATIONS:  Asylum; withholding of removal; withholding of
               removal under the Convention Against Torture.


ON BEHALF OF RESPONDENT:        ON BEHALF OF DHS:

Anthony Collins, Esquire        Leigh Mapplebeck, Esquire
664 Farmington Avenue           Assistant District Counsel - INS
Hartford, Connecticut  06105    Hartford, Connecticut


ORAL DECISION OF THE IMMIGRATION JUDGE

Introduction

        The respondent is a 40-year-old male, native and

citizen of Cameroon.  The respondent is charged in the Notice to

Appear with being a non-immigrant who remained longer than

permitted.  Based on the respondent's (indiscernible) to the

Notice to Appear, removability has been established by clear and

convincing evidence.

        The respondent applied for relief in the form of asylum

JG

under Section 208 of the Immigration and Nationality Act (the Act).  Applications for asylum shall also be considered as applications for withholding of removal pursuant to Section 241(b)(3) of the Act.  The Court will also consider the respondent's application for withholding of removal under the Convention Against Torture.

## Statement of the Facts

The respondent states that he was born into a rather wealthy family and that his father ran a plantation.  He stated he has seven siblings in Cameroon.  He stated that he received a law degree in 1986.  He stated that he worked as a bailiff.  The respondent indicated that this was not really a government job.  He states that he did investigations and enforced the decisions of judges.  He stated he had a house and a car.  He indicates he was well-respected.  He was married in 1992 and has two children.

The respondent indicates that he is from the Bamileke Tribe.  He also indicates that he's active in the Catholic Church.  He indicates that he was a member of a Catholic organization called Justice and Peace, which was organized by the Catholic Church to promote peace.

The respondent stated that in January 2001, some nine persons disappeared.  There was already report of this incident in newspapers in Cameroon in middle of February 2001.

The respondent indicated that a mother of two of the person who disappeared came to him and wanted him to investigate.

JG

The respondent stated that he promised to help and that he did not accept money for this. He states he went to a police station where the people were originally taken and was told that they had gone to a Navy base. Then the respondent stated that he had known about it from the persons at the Navy base that they were removed by the base and presumably dead. Respondent stated on February 21, 2001, two of the relatives of the disappeared came to his house. The respondent told them what he heard. He also indicated that he advised them to unite with the other parents of the persons who had disappeared and he organized the (indiscernible). He indicated that a committee was formed called the Bepanda Nine. The respondent indicated he would help this group, but wanted to work behind the scenes because he wanted to have justice done. Respondent stated that he helped to draft flyers for an upcoming demonstration scheduled for March 4. Respondent stated that on several occasions, these persons came to his house.

The respondent stated that he was present at a demonstration organized on March 4, 2001, because he wanted to know what happened at the demonstration. He stated that about 3,000 or 4,000 people showed up and that the police attacked them with tear gas and water cannons. He stated that many of the demonstrators were arrested, including himself. One the newspapers, see Exhibit 4, page 17, indicates that only 100 demonstrators and seven named persons were arrested, which did

A 95 461 653                       3                    January 16, 2003

AJG

not mention the respondent. However, the State Department Report, see page 185 of Exhibit 4, mentions this demonstration. The respondent was held overnight with other demonstrators. He stated that the Chief of Police told him that the march was illegal. Respondent replied that he was not actually a demonstrator, that he was only passing by. He stated that he was released when his wife showed up with his identification card.

The respondent stated that on several occasions some relatives of the disappeared showed up at his house to help plan what the group would do.

The respondent then stated that he was requested to give a report to a Catholic newspaper about this disappearance. He stated that he gave the report to somebody from the Catholic Church on March 9, 2001. That article was subsequently published in the Catholic newspaper on March 28, 2001. This article quite specifically mentions people, including police officials who may have know about the disappearance.

The respondent that there were further demonstrations on March 11, 18 and 25, in which the respondent was not present. The respondent stated that he did not think that these people coming to his house would be subject to surveillance. He also indicated that other political groups started to get involved with this cause.

The respondent indicated on March 26, 2001, two civilians came into his office with a warrant. He stated that he

A 95 461 653                          4                          January 16, 2003

AJG

wrote that there were four men that came, because two waited in the vehicle outside. He indicates that his office was searched and that they found a copy of the report he repaired for the Catholic newspaper. He stated that based on that, they knew about his involvement with the Bepanda Nine.

The respondent indicates that he was taken to a location where he was severely tortured, including electrocuted and severely beaten; and was essentially degraded by the person who tortured him. The respondent indicated he could not provide all that information on the asylum application because it was painful for him.

The respondent stated that he was brought before a prosecutor on April 2, 2001, after his boss was contacted. Respondent said he was charged with instigating trouble against the government and revealing government secrets. He states that the prosecutor, who he knew from his job, told him that he would postpone the case and grant his temporary release which he had legal authority to do. He testified that the prosecutor told him he should leave, because he was in a dangerous position and that he must return to court on April 30, 2001.

Then the respondent indicated that his priest was called to pick him up. The respondent stated he was tortured so severely he could not walk. He stated that the priest took him to another town outside of Douala because he was afraid of the authorities in Douala. He stated that he was held for three or

A 95 461 653                         5                    January 16, 2003

AJG

four days at a hospital.  The respondent did provide some medical

records indicating that he was beaten.  The respondent stated

that he neglected to mention the medical treatment in the asylum

application because he felt it wasn't important.

        The respondent stated that the priest picked him up

from the hospital and returned him to Douala and he stayed at the

rectory.  Respondent stated that he was afraid to contact his

wife and children, because he was afraid that they would be

harmed.  He also stated that the priest told him he should leave

Cameroon.  He stated that a secretary apparently came to his

house and got a photo and his passport, and that the respondent

went to an U.S. Embassy on April 9, 2001.  He stated that he told

the Embassy that he was coming to visit.  He stated that he was

able to walk at that time, and that the injuries were such that

they weren't so apparent to the counselor officer that he had

been tortured.  He stated that the visa was issued to him.  He

then indicated he left for the United States on April 26, 2001,

by Switzerland and arrived in the United States the next day.  He

testified that a friend, an acquaintance of his was able to get

him through the authorities in the airport.

        Respondent stated that because of the phymatic nature

of the torture, he felt he did not effectively prepare for his

asylum application.  He stated it was prepared by a non-attorney.

He stated that the application for asylum was rushed in order to

meet the one year deadline.  He indicates that he does have some

A 95 461 653                    6                January 16, 2003

AJG

money sent to him from Cameroon, and that he is active in the

Catholic Church here in the United States that helps him out.

The respondent indicates that he's gotten some

communication through letters from his wife.  There is a letter

from an attorney indicating that his wife and children were

arrested on April 2, 2001, because the respondent failed to

appear for his hearing.  The letter reflects that the wife was

released the next day.  Respondent also provided a photocopy of a

warrant issued on May 3, 2001.  Respondent indicates that there

was some confusion about how long his wife was arrested for.  He

stated that he was initially told that she was held until May 14,

2001.  The respondent indicates that he did speak to his wife by

telephone in the summer of 2002, and that she is afraid of the

authorities.  The respondent indicates that he's on a death list

and if he would return to Cameroon, he would be killed.

The respondent provided a number of newspaper articles

discussing the incident of the Bepanda Nine.  The respondent also

submitted a number of letters from individuals in Cameroon.  One

of them is from an attorney who indicates that his wife was

arrested and his home was searched on May 2, 2001.  See Exhibit

4, Tab O.  There's also a letter from the Secretary General of

the Movement of Justice and Peace of the Parish of Douala.  See

Exhibit 4, Tab P.  That document states that the respondent had

problems following the affair of the missing nine and that he was

honorary president of the Movement for Justice and Peace.  There

A 95 461 653                          7                      January 16, 2003

AJG

is also a letter from the Archdiocese of Douala.  See Exhibit 4,

Tab S, signed by the Chancellor of the Archdiocese of Douala.

This letter's dated June of 2002.  It states that thanks to the

respondent's efforts, they published an article in a Catholic

newspaper about these missing persons.  It also states that the

respondent was involved in the creation of the committee of nine.

There is also a letter from the Cameroon National Chamber of

Bailiffs.  It indicates that the respondent's involved with this

disappearance of the nine individuals.  There's also a letter

from Elise Kogla.  This document states that he respondent worked

for her and that he was arrested on March 26, 2001, relating to

the Bepanda Nine.  The respondent also provided some identity

documents and other documents from Cameroon.  Lastly, the

respondent provided what he states is a warrant for his arrest

dated May 3, 2001, based on false accusations and disturbances to

law and order.  See Exhibit 4, Tab II.

The Court viewed the State Department Report for

Cameroon for 2001.  It states that the government's human rights

record still remained poor, and the government continued to

commit serious human rights abuses.  The article mention the

incident in which the nine men were disappeared following arrest

and that sources believed they were executed.  It states that

there are also other reported instances of summary executions.

The Report states that numerous prisoners died in custody due to

abuses by the security forces and harsh prison conditions.

A 95 461 653                          8                    January 16, 2003

AJG

The page 173 and 174 of the Report describes the protest involving the Bepanda Nine. It states that the police forcefully, sometimes violently, suppressed weekly demonstrations. It states on March 20, 2001, the president ordered an investigation into that disappearance and transferred some military commanders. There are also reports that members of the C-9 were apparently attempted to be bribed to stop their protest. Then the article mentions a secret military trial of officers that may be related to this incident.

The report also states that regarding torture, that a U.N. report stated that torture was widespread and used discriminantly against persons under arrest or detained. It states that the use of torture means is common. The U.N. report also stated that the vast majority of those in detention had been tortured or abused.

The report also describes a demonstration on March 4, 2001, concerning the Bepanda Nine in which several persons were arrested. It also states that on April 26, 2001, five men who were attending a meeting at a private residence in support of the Bepanda Nine were arrested and then released on May 3, 2001.

Statement of the Law

To qualify for asylum under Section 208 of the Act, the respondent must demonstrate that he is a refugee within the meaning of Section 101(a)(42)(A) of the Act. The definition of a refugee includes a requirement that the respondent demonstrate

A 95 461 653                          9                    January 16, 2003

AJG

that he has suffered past persecution and has a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group or political opinion. In determining the respondent's eligibility for asylum, the Court will be guided by the regulations found at 8 C.F.R. Section 208.13(b). Since the well-founded fear standard required for asylum is more generous than the clear probability standard for withholding of removal, the Court will be guided by the well-founded fear standard when reviewing the respondent's application, because if he fails to meet the well-founded fear standard, it follows that he fails to meet the clear probability standard required for withholding of removal.

### Analysis and Findings

Essentially, the issue in this case boils down to the respondent's credibility. The Court finds that it is very clear that if the respondent's testimony is to be found credible, that he has established past persecution based on imputed political opinion.

The issue in this case is whether the respondent should be found credible or not credible. The Immigration Service Asylum Officer raised some concerns about the respondent's credibility. Those concerns are some inconsistencies including how long his wife was held by the authorities in May 2001 and some omissions concerning the respondent's hospitalization, as well as why the respondent would take such a risk by showing at

A 95 461 653                    10                    January 16, 2003

\JG

the demonstration and why he allowed Mr. Kouatou to come to his

house.

The Court certainly has some credibility concerns about

why the respondent, if he was such a well-know person in

Cameroon, is not mentioned in either articles on Cameroon or in

other human rights publications. The Court also finds it curious

why he went to a demonstration and why he would take such risks

to have members of the Bepanda Nine come to his house, as well as

how the respondent was able to get a U.S. visa and to disguise

the torture if it was such severe torture. The Court finds this

to be legitimate concerns, concerning his credibility.

However, the Court in looking at all the evidence and

testimony, finds that by and large the respondent's testimony is

consistent with this asylum application and what he told the

Asylum Officer. In addition, it appears that his testimony is

generally corroborated by the documents he filed in support of

his application. In addition, the respondent generally explained

the discrepancies between his testimony and what he had either

written down in his asylum application or he told the Asylum

Officer.

Then the issue is whether these concerns with the

respondent's credibility are significant enough to find the

respondent's testimony to be not credible. The Court finds that

while they are legitimate concerns, they do not rise to the level

of a finding that the respondent's testimony lacks credibility.

A 95 461 653                    11                    January 16, 2003

AJG

The respondent has explained that he did feel strongly about this case. He also indicated he was involved with this organization called Justice and Peace. Respondent indicates that he was able to get the U.S. visa because he was able to walk by that time and was able to disguise the injuries. While the Court does have some concerns about the plausibility of the respondent's explanations, the Court simply cannot find that his testimony is not credible.

Accordingly, the Court finds that the respondent has met his burden of proof to establish past persecution, as well as a well-founded fear of future persecution. There appears to be no adverse factors in this matter. And, the Court will grant the respondent's asylum application in the exercise of discretion.

## ORDERS

IT IS HEREBY ORDERED that the respondent's application for asylum under Section 208 of the Act is granted.

_____
MICHAEL W. STRAUS
Immigration Judge

A 95 461 653                    12                    January 16, 2003

04/23/2004  02:13

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
Hartford, Connecticut

EXHIBIT-L 1

File A 95 461 653                                    September 18, 2003

In the Matter of

RICHARD SITCHA,                    )        IN REMOVAL PROCEEDINGS
                                   )
            Respondent             )

CHARGES:        Section 237(a)(1)(B) of the Immigration and
                Nationality Act - non-immigrant overstay.


APPLICATIONS:   Asylum; withholding of removal; withholding of
                removal under the Torture Convention.


ON BEHALF OF RESPONDENT:           ON BEHALF OF DHS:

Anthony Collins, Esquire           Leigh Mapplebeck, Esquire
664 Farmington Avenue              Assistant District Counsel
Hartford, Connecticut  06105       Hartford, Connecticut


ORAL DECISION OF THE IMMIGRATION JUDGE

Introduction

        The respondent had an asylum hearing with this

Immigration Court.  On January 16, 2003, this Immigration Judge

granted the respondent's application for asylum.  The Department

of Homeland Security filed a motion to reopen based on a

counselor investigation done in Cameroon.  This Immigration

Judge, based on the information, reopened the case on March 13,

2003.  The matter was set down for an individual hearing today.

Statement of the Facts

JG

The Court adopts the same statement of fact in its oral decision rendered in January of 2003. However, subsequent to the reopening of this matter, additional facts were presented which will be discussed.

The Department of Homeland Security submitted a report from a counselor investigator. An assistant counselor investigator attached the American Embassy in Yaounde, Cameroon. The counsel investigator, Mr. Tiku, testified by telephone today. Mr. Tiku testified that his job duties are to investigate visa fraud, as well as other cases referred to him by the Department of Homeland Security and that he has done so for the previous eight months. Before that, he was hired as a clerk in the counselor section at the Embassy in 2001. He indicated that he must conduct many of his investigations by telephone due to resource constraints and the distance between Yaounde and Douala, where the respondent lived.

Mr. Tiku testified that he did speak with a Madam Kogla. He affirmed that the respondent was a bailiff in Cameroon and stated that he had passed the exam and was waiting for the government to confirm and authorize his activities.

The respondent also testified that he spoke with the Cameroon Bar Association representative for Littorla, a Charles Tchoungang. He testified that Mr. Tchoungang was the representative for the Cameroon Bar Association and was a lead attorney for the families of the Bepanda Nine. According to Mr.

A 95 461 653                    2                    September 18, 2003

JG

Tiku, Mr. Tchoungang told him that Mr. Sitcha played no role in
the investigations.  He also testified that he spoke to Kouatou
Betheel, the mother of one of the missing boys.  And she told Mr.
Tchoungang that she did not know the respondent.  He also
testified that he, Mr. Tchoungang, in his role as an investigator
and an attorney representing the Bepanda Nine families, did not
know the respondent.

There was also an e:mail from Mr. Tiku regarding a
conversation with a Father Jean Pierre Mukengesahy.  He stated
that this Jean Pierre Mukengesahy was a priest with the Douala
Archdiocese.  He indicated that he was trying to get information
on the respondent regarding the Bepanda Nine.  He stated,
according to Mr. Tiku, that Father Jean Pierre did conduct
investigations regarding the Bepanda Nine, but he did so alone.
He also indicated that he did not receive any report from the
respondent.  He also indicated that he does not know the
respondent.

The respondent submitted an additional letter from an
Ngaloho Andre.  See Exhibit 9, Tab B.  This individual writes
that he's a commandant in the Cameroon army for the last 15
years, and he has known the respondent since childhood.  He
writes that the respondent truly intervened in the search of
truth in the affair of the Bepanda Nine.  He indicated that he
had to flee for his life from Cameroon.  He also writes that Ms.
Kogla and Ms. Kouatou, who said that they were questioned

A 95 461 653                          3                   September 18, 2003

JG

regarding Mr. Sitcha.  He writes that Ms. Kogla wrote a letter of support for the respondent and that the government closed her office and that Ms. Kouatou told her that not knowing the reasons for the questions, she said simply she did not know Mr. Sitcha.

## Statement of the Law

The Court will adopt the same statement of the law as its oral decision dated January 1993.

## Credibility

In the Court's decision of January 1993, the Court expressed significant concerns about the respondent's credibility.  The Court noted some of the credibility concerns expressed by the Asylum Officer, which included some discrepancies about when his wife was detained allegedly, detained in May 2001 and some omissions regarding his hospitalization and why he allegedly took such risks.  The Court had also expressed credibility concerns as to why the respondent was not mentioned in any of the articles about the Bepanda Nine and why he would go to such risks to appear at a demonstration and have families of the Bepanda Nine appear at his house.  The Court had also plausibility concerns about how the respondent could obtain a U.S. visa despite being severely tortured.  The Court find at that time, looking at all the evidence, that the evidence was consistent and corroborated, and that the respondent had adequately explained discrepancies.  The Court concluded that while the Court had credibility concerns, they were not

A 95 461 653                          4                     September 18, 2003

AJG

sufficient to make a finding that the respondent was not credible.

After listening to the new evidence and testimony, the Court now finds that the respondent is not a credible witness. The Court had previously expressed doubts about the respondent's credibility and now based on the additional information, the Court cannot find that the respondent is a credible witness. The Court makes this finding based upon the following.

The Court would note that the issue about the respondent's exact status as a bailiff does not undercut the respondent's credibility. The main problems concerning the respondent's credibility are the counselor investigator's discussion with Charles Tchoungang and with Father Jean Pierre. The crux of this case is the respondent's alleged assistance to family members of the Bepanda Nine as a lead investigator. The investigator apparently spoke with Mr. Tchoungang who said that he did not know the respondent and even questioned the family member whom the respondent allegedly assisted. This additional letter provided by the respondent, see Exhibit 9, Tab B, notes that the write of this letter met Ms. Kouatou who asserted that she was questioned. However, she was apparently questioned not by the counselor investigator, but by her own attorney. The Court frankly discredits the credibility of this letter as it would be strange why she would tell whoever was calling her that she did not know Mr. Sitcha if it was her own attorney. The

A 95 461 653                      5              September 18, 2003

AJG

Court simply does not find this letter to be credible. The Court finds that this is a significant and serious discrepancy if the lead attorney investigating this case does not know the respondent and apparently contacted his client, whom the respondent allegedly worked for in investigating this matter.

The other issue is his conversation with Father Jean Pierre. This is also a very important part of this case. What allegedly got the respondent in trouble was the report he had given to this priest or chancellor, which was allegedly published in the paper. He also alleges that this report was seized by the authorities which was the basis of his arrest and detention. Again, the investigator contacted Father Jean Pierre and who apparently did not know who the respondent was. He also indicated that he did not receive any reports. More importantly, there is a letter in Exhibit 4, Tab F, allegedly from Father Mukengesahy stating that he knew the respondent, he knew his situation. He also writes in the letter that due to his effort, they were able to publish an article about the execution of the Bepanda Nine. Based on that evidence and testimony, it appears that the two vital aspects of the respondent's credibility have been undercut. The Court does not find that the respondent is a credible witness.

## Analysis and Findings

Based on the Court's adverse credibility finding, the Court does not find that the respondent has established past

A 95 461 653                    6                    September 18, 2003

AJG

persecution.

The Court does not find that based on its adverse credibility finding, that the respondent has a well-founded fear of future persecution if he had to go back to Cameroon. Accordingly, the Court must deny his application for asylum.

Since the respondent's failed to meet the well-founded standard, it follows that he fails to meet the clear probability standard for withholding of removal. Accordingly, his application for withholding of removal under Section 241(b)(3) of the Act is denied.

The next determination is whether the respondent's established that it's more likely than not that he'd be tortured if returned to Cameroon. The Court finds that the respondent's failed to meet that burden of proof. The Court does not find that based on it's adverse credibility finding that the government of Cameroon would be inclined to torture the respondent.

It appears that the respondent does not have a valid passport. Accordingly, it appears that he appears to be ineligible for post-merits voluntary departure.

### ORDERS

IT IS HEREBY ORDERED that the respondent's application for asylum under Section 208 of the Act is denied.

IT IS FURTHER ORDERED that the respondent's application for withholding of removal under Section 241(b)(3) of the Act is

A 95 461 653                    7                    September 18, 2003

\JG

denied.

IT IS FURTHER ORDERED that the respondent's application for withholding of removal under the Torture Convention is denied.

IT IS FURTHER ORDERED that the respondent be removed to Cameroon.


MICHAEL W. STRAUS
Immigration Judge

A 95 461 653                          8                    September 18, 2003